UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15 CR 350 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| ANDREW SHELTON, et. al. | ) | |

## **<u>GOVERNMENT'S SANTIAGO PROFFER</u>**

The UNITED STATES OF AMERICA, by ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits this evidentiary proffer pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), and moves that the Court admit coconspirator statements against defendants pursuant to Fed.R.Evid. ("Rule") 801(d)(2)(E).

## I.      **Introduction**

On April 12, 2015, two separate robbery crews planned to steal items from cargo trains in the Chicagoland area.    That same evening, a cargo train containing 318 firearms from the Ruger factory in New Hampshire, which were enroute to Spokane, Washington, pulled into a rail yard in Chicago.    The first robbery crew was comprised of defendants Terry Walker, Patrick Edwards, Dandre Moody, Frederick Lewis and Marcel Turner.    The second robbery crew was comprised of defendants Andrew Shelton, Elgin Lipscomb, and Alexander Peebles.

While both robbery crews were searching the trains for items to steal, they encountered each other, recognized one another from the neighborhood, and agreed

to work together to steal over 100 of the firearms. The two crews unloaded the firearms, called their drivers to come and pick them up near the tracks, and picked a location together to bring the stolen firearms. All eight codefendants unloaded the firearms into the basement of Lipscomb's residence, and decided to return to the tracks together to continue to steal additional firearms from the train. After loading up a second round of stolen firearms into their vehicles, the eight codefendants returned to Lipscomb's residence, again unloaded the stolen firearms into Lipscomb's basement, and then distributed the guns to each individual. Over the next few days, the defendants worked together to sell as many of the stolen firearms as possible before their ultimate arrest by law enforcement.

Defendant Nathan Driggers purchased 30 of the firearms from co-defendants Terry Walker, Frederick Lewis, and Marcel Turner the day of the robbery. Defendant Walker negotiated the sale for all 30 of the firearms and Driggers paid the men approximately $8,000.

After the robbery, Defendant Gates purchased approximately seventeen of the stolen firearms from defendants Peebles and Lipscomb.

The defendants were all charged with a combination of charges including possession of a firearm by a prohibited person, in violation of Title 18, United States Code, Section 922(g), possession of a stolen firearm, in violation of Title 18, United States Code, Section 922(j), and cargo theft, in violation of Title 18, United States Code, Section 659 .In this submission, the government describes the law governing

coconspirator statements, outlines some of its evidence establishing the charged conspiracy and sets forth some of the coconspirator statements for which a pre-trial ruling by the Court is requested. The trial is scheduled for April 17, 2017.

## II.    Governing Law

This proffer begins by discussing case law governing the admissibility of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E) and, alternatively, other provisions of Federal Rule of Evidence 801(d)(2). Next, the government summarizes some of the evidence supporting the admission of coconspirators' statements at the trial of the defendants. The government is not detailing all of its evidence that would go to show the existence of the conspiracy or all of the coconspirator statements that were made in furtherance of the conspiracy charged in the indictment. Rather, this proffer highlights for the Court some of the government's evidence in order to establish to the Court the existence of the conspiracy described in Count One and the roles of the various conspirators. Thus, this proffer does not list all of the government's witnesses and the evidence each will present, nor does it provide all of the evidence that will be presented by those witnesses who are named.

### A.    Admissibility of Coconspirator Statements-General Principles

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements

3

against defendants is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy or joint venture existed; (2) defendants and the person making the cited statements were members of the particular conspiracy or joint venture; and (3) the statements were made during the course and in furtherance of the conspiracy or joint venture. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Westmoreland,*312 F.3d 302, 309 (7th Cir. 2002).

In this Circuit, the preferred way for the government to make its preliminary "coconspirator statement" factual showings is by the filing of a pretrial written proffer of the government's evidence. *United States v. Haynie*, 179 F.3d 1048, 1050 (7th Cir. 1999).

### 1.    Membership in and Existence of the Conspiracy

The Court should consider the proffered coconspirator statements in determining both the existence of a conspiracy and a defendant's participation in it. *Bourjaily*, 483 U.S. at 180 (1987); Fed. R. Evid. 801(d)(2)(E) ("the contents of the statements shall be considered..."). The admissibility of conspirators' declarations "is not contingent on demonstrating by non-hearsay evidence either the conspiracy or a given defendant's participation." *United States v. Martinez de Ortiz*, 907 F. 2d 629, 634 (7th Cir. 1990) (en banc). However, the contents of the proffered coconspirator statements "are not alone sufficient" to establish the existence of a conspiracy and a defendant's participation in it. Fed. R. Evid. 801(d)(2)(E). "The Court must consider in addition [to the coconspirator statements themselves] the circumstances

surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or the evidence corroborating the contents of the statement. . . ." Fed. R. Evid. 801 advisory committee's notes (1997 Amendment).

The evidence showing a defendant's membership in a conspiracy may be either direct or circumstantial evidence. *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000); *United States v. Patterson*, 213 F.Supp.2d 900, 910-11 (N.D. Ill. 2002). Indeed, "[b]ecause of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendants' participation can usually be established only by circumstantial evidence." *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983) *cert. denied Strong v. United States*, 467 U.S. 1216 (1984).

Certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries to be made as to the existence of a conspiracy or joint venture and a defendant's membership in it. As the Supreme Court stated:

> A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. [citation omitted]. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other. If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.

*Salinas v. United States*, 522 U.S. 52, 63-4 (1997) (internal citation omitted).

For instance, the government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy.

Any of the defendants may be found guilty even if they joined or terminated their relationship with core conspirators at different times. *United States v. Morrow*, 971 F.Supp. 1254, 1256-57 (N.D. Ill. 1997) (citing *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985), *cert denied*, 474 U.S. 818 (1985)).

### 2. Statements Made in Furtherance of the Conspiracy

It has always been clear that a court can consider a proffered coconspirator statement itself in determining whether it was made "in furtherance" of the conspiracy. *United States v. Shoffner*, 826 F. 2d 619, 627 n.12 (7th Cir. 1987). In determining whether a statement was made "in furtherance" of the conspiracy, courts look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *Id*. at 628; *United States v. Oliva*, No. 02 CR 275, 2003 WL 367062, at 6 (N.D. Ill. Feb. 12, 2003), *aff'd*, 385 F.3d 1111 (7th Cir. 2004). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Oliva*, 2003 WL 367062, at 6; *Shoffner*, 826 F.2d at 628. The "statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Powers*, 75 F.3d 335, 340 (7th Cir. 1996). It is immaterial that statements otherwise "in furtherance" were made to a government witness or agent. *Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1985); *Morrow*, 971 F.Supp. at 1258.

Not surprisingly, given the government's "relatively low burden of proof" on

this issue, *Shoffner*, 826 F.2d at 628, the Seventh Circuit has upheld the admission of a wide variety of coconspirator statements. For example, and as detailed more extensively in the subparagraphs to this section below: statements used to recruit potential coconspirators, *id*.; to identify other members of the conspiracy and their roles, *United States v. Magee*, 821 F.2d 234, 244 (5th Cir. 1987); to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1985); as an assurance that a coconspirator can be trusted to perform his role, *United States v. Buishas*, 791 F.2d 1310, 1315 (7th Cir. 1986); update others on a conspiracy's progress, *United States v. Potts*, 840 F.2d 368, 371 (7th Cir. 1987); control damage to an ongoing conspiracy, *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988); and attempt to conceal the conspiracy, *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987), have been approved as "in furtherance of" conspiracies. *Oliva*, 2003 WL 367062, at 6. Furthermore, conversations regarding the sale of drugs and the arrangement of payment and/or delivery have been held to have been made in furtherance of the conspiracy. *Id*. "Conspiracy is a serious business, and talk about it among or by the conspirators should not be presumed to be unrelated to the accomplishment of the conspiracy's goals." *United States v. Pallais*, 921 F.2d 684, 688 (7th Cir. 1990).

It is also clear that "statements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive late to join a going concern." *United States v. Potts*, 840 F.2d at 372 (citing cases). Moreover, "conversations made by conspirators to prospective coconspirators

for membership purposes are acts in furtherance of the conspiracy." *United States v. Shoffner*, 826 F.2d at 628 (quoting and citing cases). A conspirator who has become less active in the conspiracy nevertheless is liable for his conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *United States v. Maloney*, 71 F.3d 645, 654-55 (7th Cir. 1995) (mere inactivity on the part of the conspirator is not sufficient to constitute withdrawal).

So, in general, statements that are "part of the information flow between conspirators intended to help each perform his role" are statements "in furtherance." *United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002); *United States v. Hunt*, 272 F. 3d 488, 495 (7th Cir. 2001). Similarly, assurances that a coconspirator can be trusted or relied upon to perform his role are considered to further the conspiracy. *United States v. Buishas*, 791 F.2d 1310, 1315 (7th Cir. 1986). In addition, statements designed to conceal a conspiracy also are deemed to be "in furtherance" where ongoing concealment is a purpose of the conspiracy. *Gajo*, 290 F.3d at 928-29. Therefore, "[s]tatements made to keep coconspirators informed about the progress of the conspiracy, to recruit others, or to control damage to the conspiracy are in furtherance of the conspiracy." *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995); *see Hunt*, 272 F.3d at 495 (although defendant was not involved in the actual sale of drugs, statements regarding his participation in and protection of the proceeds of the drug conspiracy by laundering and counting its money were admissible).

Also, any statement made by a conspirator during and in furtherance of a

conspiracy is admissible against all coconspirators. *United States v. Rivera, et al.*, 2005 WL 1412033 at *1 (7th Cir. June 16, 2005) (court admitted into evidence a letter written by a coconspirator who was not on trial). Whether any coconspirator heard or saw, in the case of a letter or other writing by a coconspirator, that statement is irrelevant; agency, not knowledge is the theory of admissibility once a foundation is laid. *Id.*; *See also United States v. Martinez de Ortiz*, 907 F.2d 629 (7th Cir. 1990).

### a.    Statements Made to Execute a Conspiracy

Statements made by conspirators to conduct the business of the conspiracy and to accomplish its goals are "classic examples of statements made to conduct and further" a conspiracy. *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991). Statements such as these, which are "intended to promote the conspiratorial objectives," are readily admitted pursuant to Rule 801(D)(2)(E). *See, e.g., United States v. Sinclair*, 109 F.3d 1527, 1534 (10th Cir. 1997); *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994); *United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir. 1982), *cert. denied*, 459 U.S. 1117 (1983). Statements which prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *United States v. Monus*, 128 F. 2d 376, 392 (6th Cir. 1997); *See also United States v. Smith*, 833 F.2d 213, 219 (10th Cir. 1987) (sole purpose of conversation from coconspirator's perspective was to promote conspiracy's unlawful objectives; coconspirator's responses to individual's questions were

designed to whet individual's interest in acquiring stolen property). Whether a particular statement tends to advance the objectives of the conspiracy or to induce the listener's assistance is determined by an examination of the context in which it is made. *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir 1989).

### b. Statements Regarding a Conspiracy's Activities

Statements "describing the purpose, method, or criminality of the conspiracy," are made in furtherance of the conspiracy because conspirators make such statements to guide each other toward achievement of the objectives of the conspiracy. *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992). Similarly, statements that are part of the information flow between conspirators made in order to help each conspirator perform his role are "in furtherance" of the conspiracy, *United States v. Godinez,* 110 F.3d at 454; *Garlington*, 879 F.2d at 283-84; *Van Daal Wyk,* 840 F.2d at 499. Statements to assure that a coconspirator can be trusted to perform his role also satisfy the "in furtherance" requirement. *United States v. Buishas*, 791 F.2d 1310, 1315 (7th Cir. 1986); *United States v. Romo*, 914 F.2d 889, 897 (7th Cir. 1990); *United States v. de Ortiz*, 907 F.2d at 635-36.

### c. Statements to Recruit Conspirators

Statements made to recruit potential members of the conspiracy are made "in furtherance" of the conspiracy. *United States v. Godinez*, 110 F.3d at 454; *Shoffner,* 826 F.2d at 628; *United States v. Doerr*, 886 F.2d at 951; *Garlington*, 879 F.2d at 283.

### d. Statements Regarding the Activities of Other Conspirators Designed to Inform or Reassure

Statements made by conspirators to other individuals who participate in, or interact with, the conspiracy contribute to the conspiracy. In *United States v. Van Daal Wyk*, 840 F.2d 494 (7th Cir. 1988), the government sought to admit statements made by a drug wholesaler to one of his couriers concerning the defendant. The pertinent statements identified the defendant as a dealer of the wholesaler who owed the wholesaler money for cocaine. In addition, the wholesaler had instructed his courier not to deliver any additional quantities of cocaine to the defendant. These statements were held to be in furtherance of the conspiracy and admissible.

The Seventh Circuit has also found that "[s]tatements made to keep coconspirators informed about the progress of the conspiracy, to recruit others, or to control damage to the conspiracy are made in furtherance of the conspiracy." *Stephenson,* 53 F.3d at 845; *United States v. Curtis*, 37 F.3d 301, 307 (7th Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995). As the Seventh Circuit held in *United States v. Pallais*, 921 F.2d at 688:

> [t]he exchange of information is the lifeblood of a conspiracy, as it is of any cooperative activity legal or illegal. Even commenting on a failed operation is in furtherance of the conspiracy, because people learn from their mistakes. Even identification of a coconspirator by an informative nickname . . . is in furtherance of the conspiracy, because it helps to establish, communicate, and thus confirm the lines of command in the organization. Such statements are "part of the information flow between conspirators intended to help each perform his role," and no more is required to make them admissible.

The same logic dictates that discussions concerning a conspiracy's successes are

admissible as statements made in furtherance of the conspiracy. *See id.; Van Daal Wyk*, 840 F.2d at 499 ("statements were not made in superfluous causerie; they were part of the information flow between conspirators intended to help each perform his role").

Statements intended to reassure the listener regarding the progress or stability of the conspiracy also further the conspiracy. A coconspirator's statement describing a defendant's past drug deals furthered the conspiracy by reassuring the listener that the defendant would be a reliable source. *United States v. Sophie*, 900 F.2d 1064, 1073 (7th Cir. 1990). Likewise, statements made to reassure and calm the listener may further the conspiracy as well. *Garlington*, 879 F.2d at 284 (upholding admission of coconspirator's statement to defendant in a murder conspiracy, "We're going to take care of him," reasoning that the statement encouraged the defendant to perform his task in the conspiracy). In *United States v. Molinaro*, 877 F.2d 1341, 1343-44 (7th Cir. 1989), the defendant sought to preclude the admission of statements between conspirators in which they were complaining about a third conspirator's handling of the delivery and payment for narcotics. The defendant argued that these statements were mere idle chatter and not in furtherance of the conspiracy. The Seventh Circuit rejected the defense's position, finding that the statements were made to iron out disputed details of the conspiracy and to control the damage apparently done to the conspiracy by the third conspirator.

### e.    Statements Relating to the Progress and Past Accomplishments of the Conspiracy

Statements made by conspirators concerning past exploits by members of the conspiracy are in furtherance of the conspiracy when made to assist in managing and updating other members of the conspiracy. *Potts*, 840 F.2d at 371; *Molt,* 772 F.2d at 368-69. Similarly, statements regarding a conspirator's failure to fully accomplish the objective of the conspiracy are admissible "as updates on the status of the conspiracy" and how that status affected the future of the conspiracy.    *United States v. Doyle*, 771 F.2d 250, 256 (7th Cir. 1985).

### f.    Statements to Conceal the Criminal Objectives of the Conspiracy

Finally, statements made to conceal the criminal objectives of the conspiracy are made "in furtherance" of the conspiracy where, as here, ongoing concealment is one of its purposes. *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *United States v. Mackey*, 571 F.2d 376, 383 (7th Cir. 1978).   "Avoiding detection by law enforcement officials clearly furthers the aims of a conspiracy." *United States v. Troop*, 890 F.2d 1393, 1404 (7th Cir. 1989) abrogated on other grounds in *United States v. Durrive*, 902 F.2d 1221, 1228 (7th Cir. 1990) (holding that the government must prove that the standard of review for determining whether the defendant joined the conspiracy must be substantial evidence). Statements made to control damage to an ongoing conspiracy have also been found to have been made in furtherance of the conspiracy. *See Van Daal Wyk*, 840 F.2d at 499. The use of

13

violence and threats to intimidate the members of a conspiracy and to protect its secrecy are also relevant to and in furtherance of the ongoing conspiracy. *United States v. Markowski*, 772 F.2d 358, 366 (7th Cir. 1985).

## B. The Absence of Confrontation Issues With Coconspirator Statements

No separate Sixth Amendment confrontation issues are posed at a joint trial by the use of a non-testifying coconspirator's statements which are offered for their truth against a defendant. This is because "the requirements for admission under Rule 801(d)(2)(E) are identical to the requirements of the Confrontation Clause." *Bourjaily*, 483 U.S. at 182. Thus, there are no "constitutional problems" once Rule 801(d)(2)(E)'s requirements have been met. *Id.* As a result, in weighing the admissibility of proffered coconspirator statements, the trial court should not consider whether or not the coconspirator-declarant is "unavailable." *United States v. Inadi*, 475 U.S. 387, 400 (1986). A court also need not engage in an independent inquiry into the "reliability" of the proffered statements. *Bourjaily*, 483 U.S. at 183-84.

This long-standing rule was not affected by the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004). In *Crawford*, the prosecution introduced a tape-recorded statement made before trial by the defendant's wife to law enforcement. *Id.* at 38. At trial, however, the wife was unavailable as a witness due to the state's spousal privilege law, and thus the defendant did not have an opportunity to cross-examine her. *Id.* at 40. The Court ruled that admission of the

wife's statement violated the Sixth Amendment's Confrontation Clause, holding that where the government offers at trial hearsay that is "testimonial" in nature, the Confrontation Clause of the Sixth Amendment requires actual confrontation, *i.e.*, cross examination, regardless of how reliable the statement may be. *Id.* at 51-52. The Supreme Court's limitation on its decision to cover only those statements that are "testimonial" in nature is what distinguishes that ruling from the evidence sought to be admitted, which includes "garden variety" co-conspirator statements. Under *Crawford*, co-conspirator statements are a recognized exception to the strictures of the Sixth Amendment because they are not testimonial in nature. *Id.* at 56; *United States v. Hargrove*, 508 F.3d 445 (7th Cir. 2007) (holding co-conspirator statements are not hearsay and do not implicate the Confrontation Clause); *United States v. Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005) ("*Crawford* did not change the rules as to the admissibility of co-conspirator statements"). Therefore, since co-conspirator statements are not "testimonial" hearsay statements, *Crawford* is not implicated, and those statements may be admitted without offending the Sixth Amendment.

Moreover, the recognition of coconspirator statements as non-testimonial in nature was not affected by the Supreme Court's decision in *Davis v. Washington*, 547 U.S. 813 (2006). In *Davis*, the Supreme Court focused specifically on statements made in the context of police interrogation. *Id.* at 822. In evaluating two different statements made to law enforcement, the Court determined that statements are

nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* Conversely, statements are considered testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

### C.     Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy are independently admissible and do not require a Rule 801(d)(2)(E) analysis. For example, the coconspirator statement rule is also not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification; an example would be an order, instruction, or a suggestion. *See United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). A number of the statements made by the coconspirators in this case fall under this category, *i.e.* instructions as to where to meet and when.

This rule defines "statement" as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). More importantly, the

coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).[1]   Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy.   *Gajo*, 290 F.3d at 929-30; *See, e.g., United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.[2]

## III.   Proffer of Expected Government's Evidence Regarding the Existence of the Conspiracy

At trial the United States will prove that beginning in the early morning hours of April 12, 2015, two separate robbery groups who were familiar with each other from the neighborhood met up by chance at the rail yard as both crews were targeting the same cargo trains to rob.   The first robbery crew was comprised of defendants Andrew Shelton, Elgin Lipscomb, and Alexander Peebles.   The second crew was comprised of defendants Terry Walker, Patrick Edwards, Dandre Moody,

---

[1]   Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

[2] Of course, in many cases, statements by an alleged coconspirator will include a combination of declarations offered for the truth of the matters asserted and declarations offered for other non-hearsay purposes.

Frederick Lewis and Marcel Turner. After meeting up on the tracks, the eight defendants conspired together to steal over 100 firearms from one of the box cars. The eight men worked together to unload the firearms, move the firearms to waiting cars on the side of the road, select a location to store the firearms, make a return trip together back to the rail yard to steal additional firearms, and return to the residence of a co-conspirator where the firearms were stored.

The eight conspirators met in the basement of defendant Lipscomb's residence where the stolen firearms were divided up among the group with each robber receiving multiple firearms. The conspirators then worked together over the next few days to sell the stolen firearms to other individuals.

The United States will prove the events described above primarily through the testimony of three members of the conspiracy who have pled guilty and are cooperating with the government: Alexander Peebles, Elgin Lipscomb, and Marcel Turner. The United States will further prove the elements of the offense and the existence of the conspiracy through telephone records showing calls among the members of the conspiracy, cell site evidence putting the cell phones of members of the conspiracy at the rail yard and near Lipscomb's residence the night of the robbery, firearm recoveries that were traced back to the stolen shipment of guns, Facebook evidence depicting some of the stolen weapons, and evidence recovered from cellular telephones of the defendants.

All of the co-conspirator statements will be introduced through the three

cooperating witnesses and are described below.

### 1.    Alexander Peebles

Alexander Peebles was a member of the conspiracy and will testify at trial regarding his involvement in the firearms theft.    Peebles will describe the events leading up to the firearms theft as well as what occurred in the days after regarding the distribution of the firearms to other individuals.

### a.    The Planning of the Theft

Peebles will testify that late in the evening on April 11, 2015, he received a telephone call from co-defendant Lipscomb.    During the call, the two men discussed a plan to steal items from the cargo trains along with codefendant Shelton.    Peebles will testify that he, Lipscomb and Shelton often stole items from the cargo trains together.    Peebles will testify that Lipscomb later called Peebles from outside Peebles' residence and picked up Peebles in Lipscomb's vehicle.    Peebles will explain that he, Lipscomb, and Shelton drove around the area looking for cargo trains to steal from.    Around midnight, a train arrived and Peebles and Shelton exited Elgin's vehicle near the area of 84th and South Chicago.    Peebles and Shelton entered a few box cars and looked for merchandise to steal.    During the time Shelton and Peebles were in the box cars, Peebles was in cell phone contact with Lipscomb.    Peebles would tell Lipscomb the types of items they were finding. Peebles would also ask Lipscomb whether he spotted any police activity on the track. At one point, Lipscomb advised Peebles over the phone that he spotted another

group of individuals on the train tracks.

### b. The Joining of the Crews

Peebles will testify that after Lipscomb warned him and Shelton that he spotted other individuals on the track, Peebles noticed a group of individuals he recognized from the neighborhood on the tracks. Peebles will identify these individuals as codefendants Frederick Lewis, Patrick Edwards, and Terry Walker. Peebles will testify that he and Shelton spoke to Frederick Lewis and asked what types of items they had found on the trains and Lewis responded "guns." Peebles and Shelton asked if they could join in the theft of the guns and all the men started stealing the guns together. Peebles told Lipscomb over the phone the updated plan to steal the firearms with the other crew. Peebles, Shelton, Lewis, Edwards, and Walker moved the stolen firearms from the train to the side of the road.

### c. The Movement of the Stolen Guns to Lipscomb's Residence.

After both crews unloaded the firearms and moved the firearms to the side of the road, Peebles called Lipscomb and told him to meet up with the drivers from the other robbery crew who were parked at a restaurant at 83rd and S. Chicago. Peebles also heard codefendants Edwards and Walker call their drivers and told them to come to the location of the firearms. Peebles heard Edwards call Moody and told him to drive the car around. Peebles also heard Walker call Turner and tell him to drive the car around to pick up the guns. A short time later, three vehicles arrived being driven by Lipscomb, Moody, and Turner. After all eight men loaded the

stolen guns into the waiting vehicles, Peebles will testify he called Walker and asked where they should take the stolen guns. Walker stated he had people at his house and they could not go there. It was decided to take the firearms to Lipscomb's house. At Lipscomb's residence, the eight codefendants unloaded the firearms from the vehicles and moved them to Lipscomb's basement. The eight codefendants decided to all then return to the cargo train to steal additional items.

### d. Return to the Rail Yard

Peebles will testify that the entire group returned to the rail yard and Lewis shouted that he found more guns on the train. Once again the defendants worked together to unload the firearms. The firearms were loaded into the waiting vehicles and all eight codefendants returned to Lipscomb's residence where they unloaded the firearms.

### e. Dividing of the Firearms

Peebles will testify at the end of the night all eight men met in Lipscomb's basement where Walker divided up the guns among the eight men. Peebles recalled every individual receiving a similar sized pile of guns. Peebles received approximately 13 firearms.

### f. Sale of the Stolen Firearms

The following day, Peebles will testify that Walker called him and asked whether he had sold all of his firearms. Peebles will testify that Walker told him he had a buyer who wanted to purchase all of the stolen firearms. Peebles stated that

he had an individual he sold his items to, later identified as Warren Gates, who would purchase all of the firearms for $2,200.

Peebles will further testify that he accompanied codefendant Andrew Shelton to Lori Shelton's residence where Andrew Shelton sold Lori Shelton at least one firearm. After leaving Lori Shelton's residence, Andrew Shelton told Peebles that Lori Shelton bought one of the firearms and was going to sell another one to her coworker at the post office. Andrew Shelton told Peebles he sold the gun to Lori Shelton for $250. Andrew Shelton also stated that Lori Shelton offered to buy them ammunition since she had a FOID card. Peebles also stated that Shelton and Lipscomb told him they moved some of the stolen guns to Lori Shelton's residence once they learned that law enforcement was looking for the firearms.

## 2. Elgin Lipscomb

Elgin Lipscomb was a member of the conspiracy and will testify at trial regarding his involvement in the firearms theft. Lipscomb will describe the events leading up to the firearms theft as well as what occurred in the days after regarding the distribution of the firearms.

### a. The Planning of the Theft

Lipscomb will testify that late in the evening of April 11, 2015, he met up with codefendants Peebles and Andrew Shelton for the purposes of stealing from the cargo trains. Lipscomb will testify that he, Peebles, and Shelton had stolen from the trains many times previously. Lipscomb will testify that he picked up Shelton

and Peebles and drove around looking for a train to steal from. Lipscomb will testify that around midnight a train arrived and he dropped off Peebles and Shelton by the tracks. Lipscomb will testify that he maintained cell phone contact with Peebles who informed him of the items they were finding on the trains. Lipscomb will also testify that he informed Peebles of any police activity, as well as when he spotted other individuals on the tracks.

### b. The Joining of the Crews

Lipscomb will testify that he recalls Peebles telling him over the phone that he encountered Walker, Lewis, and Moody on the tracks. Lipscomb heard Lewis yell that he found guns over the phone. Lipscomb will testify that Peebles instructed him to meet up with the other drivers and pull the car along the Skyway by the tracks. Lipscomb will testify the other drivers he met up with that evening were codefendants Moody and Turner.

### c. The Movement of the Stolen Guns to Lipscomb's Residence.

Lipscomb will testify the original plan was to take the firearms to Walker's residence, but the men became concerned about police activity near Walker's residence and decided to take the firearms to Lipscomb's residence. After unloading the firearms into Lipscomb's residence, Lipscomb will testify that the men decided to return to the tracks to steal additional merchandise.

### d. Return to the Rail Yard

Lipscomb will testify that in the basement of his residence the eight men

looked at the firearms and decided to go back to look for more firearms and other merchandise. Lipscomb will explain that the eight men drove back to the rail yard and he again waited in the car while the other individuals went up on the tracks. Lipscomb will testify that he spoke to Peebles by phone during this second trip and Peebles told him they located additional firearms. Peebles later told him when to pick up the men with the second shipment of firearms. Lipscomb will testify that after unloading the firearms at his residence, Lewis said there were more firearms on the train and the men decided to go back. However, as the men headed to the tracks they noticed police activity and decided to return to Lipscomb's residence.

### e.    Dividing of the Firearms

Lipscomb will testify that at the end of the night the eight men met in Lipscomb basement with the over 100 stolen firearms. Lipscomb will testify that the firearms were split up among the men and the men left his residence.

### f.    Sale of the Stolen Firearms

Lipscomb will testify that the day after the robbery he spoke to codefendant Warren Gates and sold seven of his firearms to Gates in exchange for $3,500.

Lipscomb will testify that he was with Shelton shortly after the train theft and went with Shelton to a residence near 78th and Indiana in Chicago where Shelton sold one of the firearms to an individual for $550.

### 3.    Marcel Turner

Marcel Turner was a member of the conspiracy and will testify at trial

regarding his involvement in the firearms theft. Turner will describe the events leading up to the firearms theft as well as what occurred in the days after regarding the distribution of the firearms.

### a.    The Planning of the Theft

Turner will testify that on April 12, 2015, he received a phone call from Walker asking him to participate in a plan to steal items from the trains. Turner agreed to participate in the theft. Turner will testify that he had participated in train thefts with Walker in the past. Walker instructed Turner to drive to the train tracks near 83rd and South Chicago and wait for further instructions. Turner will testify that he when he arrived at the area near the tracks, he observed codefendant Moody in one vehicle and another individual waiting in a second vehicle.

### b.    The Movement of the Stolen Guns to Lipscomb's Residence.

Turner will testify that the men loaded the firearms into the waiting vehicles and left the area. Turner will testify that Walker got into his vehicle and the other individuals got into the other two vehicles. Turner will testify that they drove to a residence located near 76th street and Morgan. Turner will explain that eight individuals proceeded to unload the firearms and brought them to the basement of the residence.

### c.    Return to the Rail Yard

Turner will testify that the men returned to the rail yard to steal additional items before returning to the residence and splitting up the firearms.

### d. Dividing of the Firearms

Turner will testify that inside the basement of the residence, Walker and Shelton divided the firearms up among the eight men. Turner believed everyone received approximately 13 firearms. Turner will testify that he left the residence with Walker and stored his firearms in Walker's garage.

### f. Sale of the Stolen Firearms

Turner will testify that later in the day on April 12, Walker called him and told him he found someone to purchase the stolen firearms. Turner will explain that he drove to Walker's residence and met with Walker and Lewis. The three men took approximately 30 of the stolen firearms to a store located near 127th and Halsted which was a location they used in the past to sell stolen merchandise. Turner will testify that at the location Nathan Driggers was inside and he observed Driggers and Walker negotiate a price for the stolen firearms. Turner will testify that Driggers typically paid 50% of the full retail value of the firearms. Turner will testify that Driggers purchased all 30 of the firearms for approximately $8,000.

Turner will further testify that in the following days he witnessed Walker arrange for the sale of additional stolen firearms from the train to other individuals, as well as witnessing Lewis sell a firearm to an individual named "Bookie."

## IV. STATEMENTS MADE DURING AND IN FURTHERANCE OF THE CONSPIRACY

At trial, the government may seek to introduce the substance of the conversations detailed above involving the members of the conspiracy through the testimony of Peebles, Lipscomb, and Turner.

The government seeks admission of these conversations, in part, under Fed. R. Evid. 801(d)(2)(E), as statements of coconspirator made in furtherance of the conspiracy. The statements made by other individuals who are not coconspirators are admissible to provide context for the statements made by the conspirators. Moreover, the law is clear that a tape-recorded excerpt may be played in its entirety, including the statements of non-conspirators, because their statements are not offered for their truth but merely to place the coconspirator statements in context and make them intelligible for the jury. *United States v. Zizzo*, 120 F.3d 1338, 1348 (7th Cir. 1997); *United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989).

All of the statements between the parties were made in furtherance of the conspiracy because they were communications regarding the core of the conspiracy: the stealing of the firearms from the trains and the later distribution of the stolen firearms. All of the conversations relate to the planning of the theft, the logistics of the theft, and the distribution of the firearms.

As a final matter, the statements set forth throughout are ***some examples*** of the statements offered, ***which are not intended to be all encompassing*** but rather to explain the premise for the admission of the statements that fall into the

category of coconspirator statements.

## V. CONCLUSION

This proffer of evidence, which the government expects to introduce in its case-in-chief along with other evidence, demonstrates that the defendants conspired together to steal firearms from a cargo train and distribute the stolen firearms to other individuals. The government respectfully submits that the evidence recited above establishes by a preponderance of the evidence that (1) the charged conspiracy existed; (2) the defendants/declarants were members of the charged conspiracy; and (3) statements were made during the course of and in furtherance of the conspiracy.

WHEREFORE, the government respectfully moves this Court for a ruling that these statements are admissible against each of the defendants on trial.

Respectfully submitted,
ZACHARY T. FARDON
United States Attorney

By: _Christopher V. Parente_
CHRISTOPHER V. PARENTE
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300