UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15 CR 350-1 |
| | ) | |
| v. | ) | Judge John J. Tharp Jr. |
| | ) | |
| ANDREW SHELTON | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM
AND RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR**

The defendant is a multi-convicted felon who has made a career out of stealing from cargo trains. Despite being a victim to multiple instances of gun violence throughout his life and losing his own father to gun violence, the defendant was not deterred from engaging in a large-scale firearms theft and trafficking scheme. For his role in theft and trafficking of 104 firearms and exacerbating the gun violence problem in Chicago, the United States is requesting a sentence of 140 months' imprisonment.[1]

**I.    OFFENSE CONDUCT**

On April 12, 2015, Defendant Andrew Shelton joined his group of friends to drive to the rail yard and burglarize the trains as they had done many times before. Despite six prior felony convictions related to train burglaries the defendant was not

---

1 As discussed below, if the defendant's criminal history category is lower than the category V currently described in the PSR, the United States will recommend a lower sentence once the appropriate guideline sentence is determined.

deterred from once again committing this same crime. The defendant and seven other men spent over six hours making multiple trips between a stash house and the rail yard to break into a cargo train loaded with hundreds of brand new Ruger firearms. As the sun came up and the defendants were forced to end their crime spree they gathered in the basement of the stash house and examined their loot. Working throughout the night the eight men were able to amass 104 stolen Ruger firearms. The eight men split up the firearms amongst themselves and the defendant received 13 of the stolen firearms. The defendant quickly trafficked all 13 of his stolen firearms.

The defendant refused to cooperate with law enforcement in an attempt to recover any of the 13 stolen firearms he put out on the City streets. Thus, we will not likely know the full extent of the damage this defendant caused for years to come. To date, law enforcement has recovered 34 of the 104 stolen firearms throughout the Chicagoland area, including 19 of which were recovered at crime scenes. The remaining 70 illegal firearms are still floating around the City and will unfortunately continue to show up at crime scenes for many years to come.

## II. ANDREW SHELTON SHOULD RECEIVE A 140 MONTH SENTENCE.

The 3553(a) factors, namely, the seriousness of the offense, the defendant's history and characteristics, the need to protect the public, and the need to provide adequate deterrence, warrant a sentence of 140 months' imprisonment. This significant sentence is warranted because Shelton is an individual who knows better

than most the harm firearms can cause but nonetheless choose to exacerbate the gun violence problem in Chicago by stealing and later trafficking 104 illegal firearms.

### A. The Seriousness of the Offense

The seriousness of the offense is best demonstrated by picking up a Chicago newspaper and reading the headlines. Every day it is the same thing. Multiple people shot. Multiple people killed. The 104 stolen firearms which the defendant put out on the streets of this City are now essentially untraceable by law enforcement.

The defendant knows all too well how dangerous firearms can be in the hands of the wrong individuals. The defendant was shot multiple times during an attempted carjacking. A few years later, the defendant was the victim of additional gun violence when he was shot during two separate drive-by shootings in 1995 and 1996. The defendant also suffered the loss of his own father to gun violence. One would think that suffering all of this tragic pain and suffering caused by firearms would make the defendant acutely aware of the dangerousness of firearms and the harm they can cause a community when they end up in the wrong hands. Unfortunately this personal knowledge did nothing to stop the defendant from participating in this crime and helping to cause others to suffer the same pain and suffering the defendant has suffered at the hands of illegal firearms.

The harm that the defendant has caused this community by stealing 104 firearms cannot be overstated. As of today's date, law enforcement has recovered nineteen of these firearms across the City at various locations and crime scenes. These nineteen recoveries which are summarized below are the best evidence of the

seriousness of this offense and the damage that illegal firearms are doing to the City of Chicago and surrounding areas.

1. April 15, 2015: Just three days after the train theft, during a traffic stop law enforcement recovered one of the stolen Ruger firearms concealed inside a vehicle. The offender stated to law enforcement, "It's a war going on over here, y'all ain't going to protect us, my friend just got popped ten times. It ain't safe over here that's why that's in the car, but it ain't mine."

2. April 17, 2015: One of the stolen Ruger firearms was recovered laying on a porch in the Englewood neighborhood. The firearm was loaded with six live rounds at the time of its recovery.[2]

3. April 18, 2015: During a traffic stop of a stolen vehicle, law enforcement recovered one of the stolen Rugers concealed in the vehicle. The firearm was loaded with 6 rounds. The driver of the vehicle was a convicted felon and self-admitted member of the Vice Lords street gang.

4. May 21, 2015: Chicago police respond to a call of shots fired. Police arrived at the scene and chased a young male through a yard. Police lost the suspect but recovered one of the stolen Ruger firearms in the yard. The firearm was loaded with fifteen rounds of ammunition.

5. May 23, 2015: Chicago police responded to the scene of a shooting. A victim was shot multiple times. During the investigation, law enforcement searched

---

[2] Law enforcement is aware that gang members leave loaded weapons in certain areas in these neighborhoods for easy access in case of any gang conflicts.

the residence associated with the investigation and recovered one of the stolen Ruger firearms loaded with two rounds of ammunition.

6. May 27, 2015: Cook County Sheriff's Officer made a traffic stop of an individual who told officers he knew where a stolen firearm was hidden. The arrestee took law enforcement to a garbage can in Maywood and officers recovered one of the stolen firearms from the garbage can. The firearm was loaded.

7. June 13, 2015: A concerned citizen located one of the stolen Ruger firearms underneath a gutter on his property. Law enforcement recovered the weapon. It was loaded with five rounds of ammunition.

8. June 24, 2015: Chicago police approached a group of young men congregated on the sidewalk in the Englewood neighborhood. In the area of where the young men were standing, law enforcement recovered one of the stolen firearms laying on the sidewalk.

9. July 14, 2015: Chicago police made a traffic stop of a vehicle. Inside the vehicle law enforcement recovered heroin, marijuana, a digital scale, small zip lock baggies, and one of the stolen Ruger firearms. The firearm was loaded. The driver of the vehicle was a convicted felon.

10. July 21, 2015: Cook County Sheriff's officers went to a residence looking for an individual wanted on an arrest warrant for attempted murder in Colorado. Upon arrival at the residence, officers located an individual sleeping in a bed with a bin next to the bed containing three loaded firearms. One of the firearms was one of the stolen Rugers loaded with one bullet in the chamber and six rounds in

the magazine.

11. October 15, 2015: Chicago police arrested an individual for narcotics dealing and subsequently searched his residence. Inside the residence law enforcement recovered 429 individual bags of heroin, as well as narcotics packaging materials. Law enforcement also recovered two firearms, one of which was one of the stolen Ruger firearms. The stolen Ruger firearm was loaded with one round in the chamber and a drum magazine containing 22 additional rounds of ammunition.

12. January 7, 2016: Illinois State Police conducted a traffic stop of a vehicle. During a search of the vehicle officers recovered a bag of marijuana and one of the stolen Ruger firearms hidden under the driver's seat. The firearm was loaded with five rounds of ammunition.

13. February 4, 2016: Chicago Police executed a search warrant at a suspected crack house. During the search of the residence, in addition to narcotics, officers recovered one of the stolen Ruger firearms hidden under the kitchen sink. The firearm was loaded with fifteen rounds of ammunition.

14. March 17, 2016: Chicago police officers were on routine patrol when they encountered an individual with a firearm protruding from his pocket. Officers commanded the individual to stop. The individual refused to stop and a foot chase ensued. The offender was eventually captured by officers and inside the offender's pocket was one of the stolen Ruger firearms, loaded with six rounds of ammunition. The offender is a self-admitted member of the Travelling Vice Lords street gang.

15. June 10, 2016: Cook County Sherriff's Police Department received

information from a documented gang member regarding the location of a stash of concealed weapons in an abandoned lot in the Englewood neighborhood. Officers went to the location and recovered a sub machine gun, and two handguns, one of which was confirmed to be one of the stolen Ruger firearms. The serial number on the stolen Ruger had been obliterated. Law enforcement also recovered 209 rounds of ammunition stored with the firearms.

16. June 28, 2016: Chicago police officers responded to a shots fired call and encountered multiple people inside a vehicle. The vehicle fled and after a short vehicle pursuit, officers arrested all four individuals inside the vehicle. Recovered inside the vehicle was one of the stolen Ruger firearms. This stolen Ruger firearm has been preliminary linked by ballistics evidence to a shooting of an individual in Chicago on January 22, 2016.

17. October 19, 2016: FBI agents and Chicago Police gang investigation officers executed a search warrant at a residence in Chicago. During the search, agents recovered multiple firearms and narcotics. One of the firearms recovered was one of the stolen Ruger firearms. The stolen firearm was loaded. Agents charged the owner of the residence, a self-admitted "6 Ward" Gangster Disciple with possession of the stolen firearms.

18. December 11, 2016: Harvey Police Officers responded to a disturbance at a night club involving a patron with a gun. Officers pulled over the suspect vehicle and recovered one of the stolen Ruger firearms from inside the vehicle loaded with ammunition.

19.  May 25, 2017: Dolton Police Officers responded to a call of a report regarding 3 suspicious men on a porch of a boarded up property.  As officers approached, one of the men fled on foot.  Officers recovered one of the stolen Ruger firearms from the porch.  The firearm was loaded with 14 rounds of ammunition, with one bullet in the chamber.

Each of these nineteen recoveries to date highlights the incredible danger that stolen firearms present to the City of Chicago at this time. No efforts by law enforcement to stop the senseless killings in this City by keeping guns out of the hands of felons will be successful when there are individuals like the defendant and his codefendants who are willing to profit off of illegal arms trafficking in Chicago.

**B.  History and Characteristics of the Defendant and The Need To Protect The Public.**

The defendant's history and characteristics paint the picture of a career criminal.  The defendant committed his first crime at 14 when he was convicted for unlawful possession of a firearm.  Two years later the defendant escalated his criminal conduct when he used a firearm to shoot three victims resulting in a conviction for aggravated battery and a 4 year prison sentence.  The defendant continued to commit multiple felony offenses over the next 15 years consisting primarily of train burglaries.  Despite receiving multiple prison sentences, the defendant remained undeterred from robbing the trains one more time in this case.

The United States also finds the defendant's actions in stealing such a dangerous product as firearms more aggravating for this defendant since he has so

8

much first-hand experience with the harm and death that firearms can cause when placed in the wrong hands. When these men opened that train and found hundreds of firearms defendant Shelton knew all too well where those firearms were going to end up and the types of harm they would end up doing. Unfortunately, the defendant has demonstrated that he is a man who will put his own immediate self-interest above the safety of the community.

  C. **Provide Adequate Deterrence**

With over 480 people killed by guns and over 2,800 total shooting victims this year already, Chicago is in a very dark place at this time. Many of these murders and shootings are done by individuals who are using illegal firearms similar to, if not the actual ones, that the defendant helped flood our streets with as part of this crime. The defendant received prison sentences of no more than four years for his prior train thefts of items such as shoes, bicycles, and other cargo. None of those prison sentences were significant enough to deter this defendant from committing the same crime again.

While the requested sentence of 140 months' is nearly 3 times his prior sentences, such an escalation in punishment is appropriate for both specific and general deterrence purposes. The defendant has made clear through his repeated identical criminal conduct that sentences of four years imprisonment do nothing to deter him from continuing to commit the same crime. Additionally, with respect to general deterrence, this theft of 104 firearms has received significant attention in the community in part because of the gun violence problem in Chicago. It is important

for the community to know that getting involved in the theft and trafficking of firearms comes with significant criminal consequences. The message must be sent that stealing sneakers and bicycles is a different ballgame than stealing and trafficking firearms. A sentence of 140 months' will hopefully help deter the next group of train thieves so that when they open that train door and find firearms they close it up immediately and move on to the next train.

### D. Need To Avoid Unwarranted Sentence Disparities

Congress instructs Courts to "avoid unwarranted sentence disparities among defendants with *similar records* who have been found guilty of *similar conduct*." 18 U.S.C. §3553(a)(6) (emphasis added). The Court has previously sentenced three codefendant in this case. Defendant Lori Shelton who purchased three of the stolen firearms received a probationary sentence. Defendants Warren Gates and Nathan Driggers, who were both "fences" who purchased firearms from the train robbers and later helped distribute the illegal firearms into the community were sentenced to 68 and 96 months' respectively.

While the requested sentence of 140 months' is much higher than these other sentences, Defendant Shelton has a more serious criminal record than the other three defendants and his conduct was much different than the three previously sentenced codefendants.

First, the defendant is being sentenced for entirely different criminal conduct than the three previously sentenced codefendants. Shelton will be the first of the actual train robbers being sentenced. The decision to steal 104 illegal firearms was

made by Shelton and his seven codefendants alone. These eight men made the decision to spend over six hours making multiple trips between the stash house and the rail yard to steal firearms. With every carload of illegal firearms they filled up and took back to the stash house these eight men knew there was money to be made in Chicago selling illegal firearms and knew exactly what types of harm these firearms would cause when put into the hands of the eventual unlawful buyers. This decision to not only take the first load of firearms, but to make multiple trips back to get as many guns as they could knowing the havoc that 104 guns would inflict on the City of Chicago is much more serious conduct than the conduct of the three prior sentenced defendants and should be treated much more severely by this Court.

This conduct is much different than the conduct of the three other defendants who have already been sentenced. Defendant Gates and Driggers were in the business of buying and selling stolen property. They would have bought whatever items the defendant decided to steal from the trains that evening. It was the defendant and his codefendants who made the decision to steal firearms, knowing their value in Chicago at this time. While they were correct there was much money to be made in stealing such a dangerous but hot commodity, they assumed a great risk that if caught they would be punished much more severely than had they stolen sneakers or clothing. They are now paying the steep price for stealing and trafficking such dangerous items as firearms.

Second, defendant Shelton's criminal history has multiple prior instances of illegal gun possession and use, and one instance of using a firearm to shoot three

victims. None of the three prior sentenced defendants had convictions for the use of a firearm to shoot others like this defendant. While it was more than 20 years ago, the defendant has three prior convictions related to the possession of illegal firearms, and one conviction of aggravated battery resulting from the defendant's shooting of three victims with a firearm. This background, coupled with the defendant's six prior felony convictions for burglarizing the trains, makes the defendant's criminal history dissimilar to the three prior sentenced codefendants.[3]

## III. RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR

Defendant raises three objections to the PSR. First, defendant disputes that he should be accountable for all 104 firearms he and his codefendants stole. Second, the defendant objects to the application of §2K2.1(b)(6)(B) "in connection with another felony offense" enhancement. Third, the defendant objects to the total number of criminal history points assessed based on his criminal history. The United States agrees with Probation that both the number of firearms and "other felony offense" enhancements were correctly applied. The United States continues to work with the Probation Officer to determine the correct criminal history category for the defendant and will provide its position to the Court at sentencing on this issue.

### 1. The Offense Involved More Than 100 Firearms.

The defendant argues that Probation erred in applying an 8 level increase to the base offense level based on the number of guns involved in the offense. The

---

[3] The United States also notes that the requested sentence is at the low-end of the advisory guideline range for this defendant.

defendant argues that since his share of the stolen firearms was 13 firearms he should only be held responsible for those 13 and not the 104 firearms that he concedes were stolen by the group.

U.S.S.G. §2K2.1(b)(1)(D) provides that if the offense involved more than 100 but less than 199 firearms, eight levels are added to the base offense level. Here, the defendant acknowledges in his plea declaration that he, along with his codefendants, "stole approximately 104 Ruger firearms from a cargo train . . . ." (DE 283, at 2). Thus, the defendant does not dispute that the crime involved the theft of 104 firearms, he simply erroneously claims that since his share of the loot was only 13 firearms he should only be accountable for those 13.

This argument is easily rejected by examining the relevant conduct definition used by the Guidelines. As part of the relevant conduct analysis the defendant is liable for all acts he personally commits, as well as acts within the scope of the jointly undertaken criminal activity that are reasonable foreseeable. §1B1.3.1(a). *See*, *United States v. LePage,* 477 F.3d 485, 491 (7th Cir. 2007) (noting "the court must look to § 1B1.3 and therefore that events in the same course of conduct or a common scheme or plan can be included in determining the number of firearms.")

The relevant conduct guideline provides that an individual is responsible for all conduct, "in the case of a jointly undertaken criminal activity . . . [for] all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connections with that criminal activity; that occurred during the commission of the

offense of conviction . . . ."

Here, the offenses of conviction are possession of a firearm by a prohibited person and possession of a stolen firearm. The defendant admitted that he assisted in the theft of all 104 stolen firearms from the train. The defendant does not dispute that he worked with his codefendants to steal all 104 firearms from the train. The defendant and his codefendants made multiple trips between the stash house and the rail yard and made the decision to continue to go back to the rail yard to amass more guns. The fact that at the end of the night the defendant's share of the 104 firearms that he helped steal was only 13 does not limit his exposure for the 104 firearms that he helped to steal that evening. The theft of all 104 firearms was within the scope of the defendant's criminal activity that evening and certainly reasonably foreseeable as the defendant helped carry the guns from the train to the awaiting vehicles and later from the vehicles to the basement of the stash house. Thus, the eight point enhancement was correctly applied and the defendant's objection should be denied.

2. **The "Another Felony Offense" Enhancement Applies.**

The defendant also objects to Probation's inclusion of the four level enhancement pursuant to §2K2.1(b)(6)(B) for possession of a firearm in connection with another felony offense.[4] The defendant argues that "there is no evidence that defendant Shelton '[u]sed or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with

---

4 As noted in the defendant's sentencing memorandum, the defendant agreed this enhancement applied in the signed plea declaration.

knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense.'" (Sent. Memo, at 3). Despite defendant's claim to the contrary, the evidence demonstrates that the defendant did possess a firearm in connection with another felony offense, namely the burglary of the train, and furthermore the evidence demonstrates the defendant transferred a firearm with reason to believe it would be possessed in connection with another felony offense, so this enhancement applies under both prongs of §2K2.1(b)(6)(B).

Guideline §2K2.1(b)(6)(B) provides a four level enhancement if the defendant "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." Based on the circumstances surrounding the theft and trafficking of the firearms in this case, this enhancement would apply under both prongs of §2K2.1(b)(6)(B).

First, the defendant possessed a firearm during the burglary of the train which is a felony offense. There is no dispute that the defendant took part in the train burglary on the night of April 12, 2015. During that robbery, the defendant acknowledges that he possessed multiple firearms.[5] Commentary 14(B) of this Guideline states that the enhancement applies "in a case in which a defendant, who,

---

[5] "Defendant thereafter helped steal and unload several boxes of guns identified inside the railroad box container. Defendant also placed several of the boxes of stolen guns into a vehicle to transport away from the rail yard." (Def Sent. Memo, at 2).

15

during the course of a burglary, finds and takes a firearm, even if the defendant did not engage in any other conduct with that firearm during the course of the burglary." The fact that the defendant possessed multiple firearms during the train burglary triggers the first prong of this enhancement.

Second, this enhancement applies under the second prong of the guideline because the defendant transferred the 13 illegal firearms with at least reason to believe they would be used or possessed in connection with another felony offense. The defendant acknowledges in his sentencing memorandum that "[a]ll thirteen (13) stolen guns accepted and received by the defendant were quickly sold."

As argued before this Court during the sentencing of codefendant Driggers, the market for stolen firearms is dominated by those people who cannot legally purchase a firearm and whose possession alone would be another felony offense, or who want an untraceable firearm in order to commit an act of violence which would also be another felony offense. The defendant certainly had at least "reason to believe" that the individuals who agreed to purchase 13 stolen firearms from him would be using those firearms in an illegal manner.

Furthermore, the Court does not need to solely rely on the strong circumstantial evidence regarding the market for stolen firearms in Chicago because there have already been multiple recoveries of these stolen firearms where these firearms have been demonstrated to be possessed or used in connection with another felony offense. As detailed above, of the 19 recoveries to date, 12 of the firearms have been possessed or used in connection with another felony offense.

The defendant's reliance on case law regarding what conduct is needed to qualify as "use" under this guideline since here commentary to the guidelines make clear that the theft of firearms during a burglary qualifies as possession and use of the firearm for purposes of this enhancement. The defendant's reliance on *United States v. Szakacs*, 212 F.3d 344 (7th Cit. 2000) is also erroneous since that case was decided before this Guideline was amended by Amendment 691 in 2006. Amendment 691 specifically added commentary 14 noted above which makes clear that that guns stolen during a burglary trigger this enhancement. *See*, *United States v. Krumwiede*, 599 F.3d 785, 790 (7th Cir. 2010) (finding enhancement to apply when firearms were stolen during a burglary of a firearms store); *United States v. Hill*, 563 F.3d 572, 581-82 (7th Cir. 2009) (finding enhancement to apply when firearms were stolen during a burglary of a residence).

## IV.  CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court impose a sentence of 140 months' imprisonment.

Respectfully,

JOEL R. LEVIN
Acting United States Attorney

By:  s/ Christopher V. Parente
CHRISTOPHER V. PARENTE
ERIC PRUIT
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-2447